| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>DISTRICT OF NEW JERSEY | |
| FORMAN HOLT ELIADES & RAVIN LLC<br>218 Route 17 North<br>Rochelle Park, NJ 07662<br>(201) 845-1000<br>Attorneys for Charles M. Forman,<br> Chapter 7 Trustee<br>Harry M. Gutfleish (HMG-6483)<br>Alexis van der Sterre (AV-2277) | |
| In Re:<br><br>NJ AFFORDABLE HOMES CORP.,<br><br>                    Debtor. | Chapter 7 Case No: 05-60442 |
| CHARLES M. FORMAN, as the Chapter 7 Trustee for NJ Affordable Homes Corp.,<br><br>                    Plaintiff,<br><br>v.<br><br>GIOVANNI DINATALE,<br><br>                    Defendant. | Adv. Proc. 07- |

**COMPLAINT TO RECOVER FRAUDULENT AND PREFERENTIAL TRANSFERS**

Charles M. Forman, the duly appointed chapter 7 trustee (the "Trustee") for NJ Affordable Homes Corp. (the "Debtor"), through his attorneys, Forman Holt Eliades & Ravin LLC, as and for his Complaint against Giovanni Dinatale (the "Defendant") to avoid and recover fraudulent and preferential transfers, alleges that:

## INTRODUCTION

1. At all relevant times, Wayne Puff ("Puff") served as the Debtor's president.

2. Puff used the Debtor and others to defraud hundreds of people out of tens of millions of dollars.

3. Puff intentionally relied on misleading property appraisals to induce investors to invest funds with the Debtor in return for mortgages that far exceeded the actual value of the mortgaged properties and offered rates of return that far exceeded rates otherwise available in the relevant market place.

4. To the extent that any given investor holds a mortgage on an income producing property or valuable property, it is mere happenstance. To the extent that any given investor holds a mortgage on a property with little value, it also is mere happenstance.

5. Eager to profit on the "too good to be true" rates of return, the Defendant invested with the Debtor while ignoring numerous red flags concerning the Debtor, its fraudulent operations and insolvency, as well as other warning signs that would have put the Defendant on notice of the avoidabilty of the transfers discussed below.

6. In this Complaint, the Trustee is seeking to avoid and recover the fraudulent and preferential transfers made to the Defendant. By doing so, the Trustee intends to create a single pool of funds to be used to provide a fair and equitable distribution to creditors of this estate.

## JURISDICTION AND VENUE

7. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 1334 and 157, pursuant to 11 U.S.C. §§ 105, 502(d), 544, 547, 548, and 550(a), and pursuant to Bankruptcy Rules 7001(1), (2) and (9).

8. This adversary proceeding is a core proceeding as that term is defined in 28 U.S.C. § 157(b)(A), (B), (F), (H), and (O).

9. This adversary proceeding arises under the United States Bankruptcy Code, 11 U.S.C. §101, *et seq.* (the "Bankruptcy Code"), and arises in and relates to a chapter 7 case pending in this District.

10. Venue is proper before this Court pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

11. On November 23, 2005, the Office of the United States Trustee appointed the Trustee to serve as the chapter 7 trustee for the Debtor's bankruptcy estate.

12. Upon information and belief, the Defendant is an individual residing at 80-21 212th Street, Hollis Hill, New York 11427.

## FACTUAL BACKGROUND

**A.    Various Investigations of the Debtor.**

13. In 2002, the State of New Jersey commenced an action against the Debtor and Puff based on an investigation by the New Jersey Bureau of Securities that resulted in the entry of a Consent Order in which the Debtor and Puff agreed, among other things: (a) to comply with the New Jersey Uniform Securities Law (1977), N.J.S.A. 49:3-47 *et seq.*; (b) not to engage in any act or practice in violation of the New Jersey Uniform Securities Law or in furtherance of any violation thereof; (c) to comply with N.J.S.A. 49:3-56 by registering in New Jersey as a broker-dealer, agent, investment adviser or investment adviser representative; (d) to sell only securities registered under the New Jersey Uniform Securities Law or the United States Securities Act of 1933; (e) not to (i) employ any device, scheme or artifice to defraud, (ii) make any statement of a material fact or to omit to state a material fact necessary in order so that such

3

statements are not misleading, and (iii) to engage in any act, practice or course of business which operates or would operate as a fraud or deceit upon any person; and (f) to offer rescission rights to investors holding fractional interests in single mortgages "pooled" with others on a single property (the "NJ Consent Order").

14. In 2004, the Commonwealth of Pennsylvania issued a Cease and Desist Order, on consent, barring the Debtor and Puff from issuing securities in Pennsylvania. That Order contained findings that the Debtor failed to make material disclosures and willfully violated Pennsylvania's securities laws.

15. On September 12, 2005, the United States Securities and Exchange Commission (the "SEC") filed a Verified Complaint against the Debtor and Puff in the United States District Court for the District of New Jersey (the "District Court"), Civil Action No. 05 Civ. 4403 (the "SEC Action").

16. In its Complaint, the SEC alleged an elaborate scheme in which the Debtor and Puff engaged in unregistered and fraudulent offerings of securities to raise more than $40 million from at least 490 investors in New Jersey and other parts of the United States.

17. The securities offered by the Debtor included promissory notes purportedly secured by real estate mortgages, investment contracts and other evidences of indebtedness.

18. On September 12, 2005, the District Court entered an Order to Show Cause, Temporary Restraining Order and Order Freezing Assets and Granting Other Relief (the "TRO") in the SEC Action, pursuant to which the Debtor, Puff, their affiliated entities and others were directed to preserve their assets and were restrained from selling, encumbering, transferring or otherwise disposing of their assets.

19. Also in the TRO, the District Court appointed the Honorable Nicholas H. Politan to serve as Receiver for the Debtor with the powers and responsibilities, among others, to: (a) take control of the Debtor's assets, including all financial accounts, and books and records; (b) use funds collected to preserve the Debtor's assets and the properties held in the names of the Debtor, the Affiliated Entities and the investors; (c) investigate assets that may have been impermissibly transferred to others; and (d) investigate the Debtor's disposition of funds derived from its unlawful sale of securities.

20. On September 26, 2005, the District Court entered an Order Granting Preliminary Injunction and Other Relief on Consent (the "PIO") in the SEC Action continuing the restraints imposed and the Receiver's powers set forth in the TRO. Puff consented to the entry of the PIO.

21. On October 5, 2005, the District Court entered an Amended Order Modifying and Granting Preliminary Relief Injunction and Other Relief in the Commission's Action (the "Amended PIO") in the SEC Action in which the Receiver was authorized to: (a) implement a sales process for the properties owned by the Debtor, the Affiliated Entities and the investors; (b) implement a process to fairly and equitable resolve the investors' claims and competing interests to the real properties; and (c) institute proceedings to recover unlawful transfers from the Debtor and others to third parties.

22. On October 31, 2005, the Receiver filed his preliminary Report (the "Report") with the District Court.

23. Based on the Report, the District Court entered an Order authorizing the Receiver to file this chapter 7 case.

24. On November 22, 2005 (the "Petition Date"), the Receiver filed a petition on behalf of the Debtor for relief under chapter 7 of the Bankruptcy Code.

5

**B.    The Ponzi Scheme.**

25.    The Debtor is an insolvent New Jersey corporation that had offices in Woodbridge and Perth Amboy, New Jersey. It purportedly operated as a real estate investment company that used funds borrowed from individuals and financial institutions to purchase residential and commercial properties, renovate the properties, and sell the properties at a profit.

26.    Prior to the Petition Date, Puff used the Debtor to operate a "Ponzi" scheme to defraud investors and others.

27.    As part of the scheme, Puff obtained investments and financing, and justified the financed amounts, by (a) obtaining or using appraisals that greatly overstated the value of properties acquired or to be renovated by the Debtor, or by (b) churning the sales of properties to and among the Debtor's affiliates, nominees, shills and investors to justify higher loan amounts.

28.    In typical "Ponzi" scheme fashion, the Debtor and Puff relied on raising money from new investors and financial institutions to pay the promised returns to earlier investors and other debts rather than from legitimate business operations.

29.    In defrauding its investors and others, the Debtor failed to disclose, among other things, that: (a) the real properties purportedly securing the notes that were sold to investors were overvalued; (b) the funds raised from investors to renovate real properties had not been and were not going to be used to renovate the real properties; (c) the Debtor's liabilities to investors greatly exceeded its assets; (d) the Debtor and Puff were using funds raised from new investors to pay interest and principal to prior investors; (e) neither the Debtor nor Puff could economically sustain or legitimately provide the excessive annual returns that were promised to investors; and (f) the Debtor was transferring substantial funds and assets to Puff, his family members and others.

30. Had the Defendant performed any due diligence prior to investing with the Debtor, the Defendant would have learned that the investment was illusory.

31. The "lifeblood" of the Debtor's fraudulent operations was funds fraudulently obtained from investors and others.

32. Puff orchestrated an aggressive and deceptive marketing campaign designed to solicit potential investors. Puff advertised the Debtor's product on the radio, in investment-related newspapers and over the internet. In addition to advertising in various media, the Debtor paid "money finders" a 4% commission for all investment dollars they successfully solicited through the offer and sale of the promissory notes.

33. Offering materials emphasized that investors could double their money in less than five years and represented to investors that they would be paid back in full at the end of their investment term. The Debtor and Puff also emphasized to prospective investors that their investments were the "best, safest collateral there is" because their investments would be secured by a first mortgage on real property – which is "exactly the same collateral that a bank gets when they loan you money to buy a home."

34. The Debtor and Puff also told prospective investors that a key point of the investment program was "a safety net of 25% or more between the appraised market value and the first mortgage." Thus, the Debtor and Puff assured potential investors that if a property owner defaulted on its obligation, it would be "meaningless to you."

C.    **The Investor Mortgage Scam.**

35. At Puff's direction, the Debtor offered to investors promissory notes secured by first mortgages on designated properties. These notes generally promised a 15% annual rate of return on a compounded basis. In most instances, interest and principal were not required to be

7

paid until the end of the term. The Debtor and Puff advertised that investors could double their investments.

36. The Debtor and Puff further represented that if a property were sold during an investor's investment term, the investor would receive a mortgage on a different property.

37. The investors typically were not involved in the selection of the properties for which the Debtor issued the first mortgages.

38. The Debtor also offered to investors promissory notes secured by second mortgages. These notes were similar to the first mortgage notes except that the investors were granted second mortgages and promised annual returns of between 16% and 25% on a compounded basis.

39. Again, the investors typically were not involved in the selection of the properties for which the Debtor issued the second mortgages.

40. With respect to both note offerings, the Debtor and Puff represented to investors that interest began to accrue as soon as the investor funds were deposited. Thus, regardless of when the Debtor acquired the properties to secure the investor notes, and regardless of whether such properties generated income, let alone profit, the investors were promised the 15% to 25% returns for the entire investment term.

41. Further, at Puff's direction, the Debtor continued to (a) sell unregistered securities, (b) employ devices, schemes or artifices to defraud, make misleading statements and engage in fraud, and (c) market and sell fractional interests in mortgages in violation of the NJ Consent Order and the New Jersey Uniform Securities Law.

**D.     Commingling of Funds.**

42.    All funds collected by the Debtor, including funds raised from investors, funds borrowed from financial institutions, rent paid by tenants, mortgage payments made by third-party property owners, and proceeds derived from property sales, were commingled in accounts maintained by the Debtor and others and were shifted among the various entities, and expended as needed, rather than on a property-by-property basis.

43.    Puff, the Debtor and the Debtor's affiliates commingled funds received from all sources without regard to the specific properties, investors and financial institutions involved.

44.    Funds obtained from loan transactions were used to pay mortgages and property-related expenses for properties other than the specific properties for which the investors were given mortgages and to make payments on prior investments.

45.    Payments to investors or other lenders were not made from or traceable to a specific property in which such investor thought that he, she or it held an interest, and were not made from or traceable to a specific mortgage granted to such investor.

46.    Funds deposited with or disbursed by the Debtor's agents involved in the fraudulent mortgage transactions, including George Otlowski, one of the Debtor's attorneys, were commingled as well.

47.    In addition, funds that were to be held by George Otlowski in trust were diverted at Puff's request to the Debtor and deposited in, among other accounts, account number 28000011959 at Hudson United Bank.

48.    Puff used the Hudson United Bank account to commingle and divert funds obtained from investors.

49. Because the funds were commingled and not accounted for on a property-by-property basis, it is impossible to distinguish between funds provided by investors such as the Defendant, funds provided by financial institutions, rents received from tenants, and funds disbursed at property sale closings.

E. **The Debtor's Insolvency.**

50. At all relevant times, the Debtor and its affiliates were insolvent.

51. From January 1, 1999 through June 30, 2005, the Debtor and its affiliates did not have the ability to pay their obligations to investors and others as they became due.

52. From January 1, 1999 through December 31, 2003, the Debtor and its affiliates sustained losses in excess of $20 million.

53. For calendar years 1998 through 2005, the Debtor's records reveal a negative cash flow from operating losses totaling $67.5 million.

54. The Debtor's records also reflect that during the same years, the Debtor accumulated $37.7 million in negative cash flow from the acquisition and sale of approximately 650 properties. These cash losses were comprised of total proceeds generated from the sale of properties of $122.9 million, less mortgages totaling $54.7 million and original purchase prices totaling $105.8 million.

55. In addition to the losses generated from the sale of properties, the Debtor accumulated approximately $30 million of operating expenses, comprised of rent, commissions, insurance, taxes, payroll, overhead and property management costs.

56. For the six months ended June 30, 2005, the Debtor and its affiliates were paying average monthly mortgage payments of approximately $350,000, while the monthly rental income over the same period averaged a meager $87,000.

57. Since the debts owed to investors and financial institutions significantly exceeded property values and income generated, Puff relied on raising money from new investors or other lenders to pay the promised returns to investors whose investments had matured and who did not re-invest their money, to investors who contracted for monthly payments, or to other investors as determined by the Debtor or Puff.

58. Without the continued flow of funds from new investors, Puff could not have continued to operate the Debtor.

59. In fact, from 1998 through 2005, the cash flow that the Debtor raised from investors was virtually equal to the Debtor's negative cash flow from its operations during the same period.

60. The Debtor's insolvency is also reflected by the facts that: (a) properties were carried on the Debtor's balance sheet at values far in excess of their true value (and in many cases, the property's ultimate sale price to a third party); (b) the Debtor significantly understated its liabilities on its internal records by failing to account for accrued interest that might be owed to investors; (c) the Debtor did not reflect as liabilities its obligations on properties titled in shills' names but otherwise owned and controlled by the Debtor; and (d) the Debtor failed to include at least $455,000.00 in loan obligations to insiders.

61. At all times relevant, the Defendant ignored warning signs that placed Defendant on notice of the Debtor's fraud and insolvency, and the fraud and collusion of all parties who acted in concert with the Debtor.

F. **The Avoidable Transfers**.

62. Prior to the Petition Date, the Debtor paid the Defendant or caused others to pay the Defendant from the Debtor's funds the amounts reflected in Exhibit A to this Complaint,

which total $311,664.67 (the "Transfers").

63. The Transfers were not derived from legitimate business or economic transactions but from funds raised from subsequent investors and other lenders.

64. The Transfers were made in connection with and as a critical component of the Ponzi scheme perpetrated by Puff and the Debtor.

65. The Transfers received by the Defendant exceeded the Defendant's investment(s) by $161,664.67.

## COUNT ONE
### (Intentional Fraudulent Transfers)

66. The Trustee repeats the allegations set forth in the prior paragraphs of this Complaint as if fully set forth herein.

67. The Transfers constitute transfers of interests of the Debtor in property.

68. The Transfers were made with actual intent to hinder, delay or defraud investors and creditors of the Debtor as to which the Debtor was or became, on or after the date of such transfers, indebted.

69. The Trustee may avoid all Transfers made within one year before the Petition Date under Section 548(a)(1)(A) of the Bankruptcy Code, and recover the value of all Transfers made within one year before the Petition Date under Section 550(a) of the Bankruptcy Code.

## COUNT TWO
### (Intentional Fraudulent Transfers)

70. The Trustee repeats the allegations set forth in the prior paragraphs of this Complaint as if fully set forth herein.

71. The Trustee may avoid all of the Transfers under N.J.S.A. 25:2-25a, 2-29 and 2-30, which are applicable under Section 544 of the Bankruptcy Code, and recover the value of all

of the Transfers under Section 550(a) of the Bankruptcy Code.

## COUNT THREE
### (Constructive Fraudulent Transfers)

72. The Trustee repeats the allegations set forth in the prior paragraphs of this Complaint as if fully set forth herein.

73. The Debtor received less than a reasonably equivalent value in exchange for the Transfers.

74. The Debtor was insolvent on the dates that the Transfers were made.

75. On the dates that the Debtor made the Transfers, the Debtor was engaged in a business or a transaction, or was about to engage in a business or transaction, for which any property remaining with the Debtor was an unreasonably small capital.

76. On the dates that the Debtor made the Transfers, the Debtor and Puff intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor's ability to pay as such debts matured.

77. The Trustee may avoid all Transfers made within one year before the Petition Date under Section 548(a)(1)(B) of the Bankruptcy Code, and recover the value of all Transfers made within one year before the Petition Date under Section 550(a) of the Bankruptcy Code.

## COUNT FOUR
### (Constructive Fraudulent Transfers)

78. The Trustee repeats the allegations set forth in the prior paragraphs of this Complaint as if fully set forth herein.

79. There exists at least one creditor whose claim against the Debtor arose prior to the date that each of the Transfers was made.

80. The Trustee may avoid all of the Transfers under N.J.S.A. 25:2-25b, 2-27a, 2-29 and 2-30, which are applicable under Section 544 of the Bankruptcy Code, and recover the value of all of the Transfers under Section 550(a) of the Bankruptcy Code.

## COUNT FIVE
### (Preferential Transfers)

81. The Trustee repeats the allegations contained in the prior paragraphs of this Complaint as if fully set forth herein.

82. All Transfers received by the Defendant on or within 90 days prior to the Petition Date, constitute transfers of interests of the Debtor in property (a) to or for the benefit of a creditor, (b) for or on account of an antecedent debt owed by the Debtor before such transfers were made, (c) made while the Debtor was insolvent, and (d) that enabled the Defendant to receive more than the Defendant would receive in this case had the Transfers not been made and had the Defendant received payment to the extent provided by the provisions of the Bankruptcy Code.

83. The Trustee may avoid all Transfers made on or within 90 days prior to the Petition Date under Section 547(b) of the Bankruptcy Code, and may recover the value of all Transfers made on or within 90 days prior to the Petition Date under Section 550(a) of the Bankruptcy Code.

## COUNT SIX
### (Accounting)

84. The Trustee repeats the allegations set forth in the prior paragraphs of this Complaint as if fully set forth herein.

85. The Trustee is entitled to an accounting of all other transfers from the Debtor to the Defendant prior to the Petition Date.

**WHEREFORE,** the Trustee hereby demands judgment against the Defendant as follows:

A. On Count One, Count Two, Count Three, and Count Four, (i) avoiding the Transfers, (ii) for the value of all of the Transfers, (iii) for attorneys' fees and costs of suit, and (iv) for such other and further relief as is just and proper.

B. On Count Five, (i) avoiding all Transfers made on or within 90 days before the Petition Date, (ii) for the amount of all such Transfers, (iii) disallowing all claims asserted by the Defendant against the Debtor pursuant to Section 502(d) of the Bankruptcy Code until such time that the Defendant has paid to the Debtor's estate the full amount of the Transfers, plus costs, interest and such attorneys' fees as may be awarded by the Court, (iv) for attorneys' fees and costs of suit, and (v) for such other and further relief as is just and proper.

C. On Count Six, (i) directing the Defendant to provide an accounting of all payments or other transfers made by the Debtor to the Defendant prior to the Petition Date, and of all investments, loans or other transfers made by the Defendant to the Debtor; (ii) for attorneys' fees and costs of suit, and (iii) for such other and further relief as is just and proper.

FORMAN HOLT ELIADES & RAVIN LLC
Attorneys for Charles M. Forman
Chapter 7 Trustee


By: /s/ Harry M. Gutfleish
    Harry M. Gutfleish
    Alexis van der Sterre

Dated: November 5, 2007

m:\cmf\njah\advpro\avoidance actions\winners\defendants\dinatale \dinatale, giovanni-complaint.doc